Case number 20-2029, Jane Doe v. City of Detroit MI. Oral argument is not to exceed 15 minutes per side. Ms. Lofbaum for the appellant. Thank you. Carol Lofbaum on behalf of the plaintiff appellant, Jane Doe. This is an important civil rights case and I'm happy to be able to present it to you during Pride Month. The legal issues presented are narrowed. First, on the hostile work environment claim, whether the city took adequate action to respond to the harassment, which escalated to include death threats directed at Ms. Doe because she is transgender. The second issue is on the retaliation claim, whether there is sufficient evidence of a causal connection between Ms. Doe's protected activity, complaining about the harassment and the death threats and the retaliation she alleges. So on the hostile work environment failure to act issue, it is Doe's position that the city's response to the harassment was either wholly inadequate or even nonexistent with respect to some of the incidents. And the district court just got it wrong in concluding that the city's response was adequate as a matter of law, as opposed to sending that issue to the jury. Less than two weeks ago, a panel of this court issued a decision in Wyatt versus Nissan North America, which speaks directly to the issue of the failure to act and when the issue needs to go to a jury. This court in Nissan agreed, quote, that Nissan's three-week delay in investigating an explicit and specific sexual harassment complaint suffices to defeat summary judgment and send the question of whether Nissan acted with reasonable care for resolution by a fact finder. So here, the city's human resources office didn't investigate the death threats at all. They didn't do anything. Not within the three weeks the Wyatt court found to be unreasonable, not at all. The only investigation of sorts occurred in July by the police. This was two months after the death threats and two months after Ms. Doe's police report. The police actually called Ms. Doe the day after her story aired on the local news. And by the time the police got involved, they apologized that her complaints had slipped through the cracks and agreed it was too late that there was really nothing they could do at that point to catch the perpetrator, given the time that had passed. So under Smith v. Rock 10, which I've quoted in my brief, and under the Wyatt case, this claim should never have been dismissed on summary judgment. I'd like to ask you a question. Do you hear us when we say something? It says we're muted. I don't have an audio. I'm sorry. It's not your fault. We should just not mute, right, at all. I'd say let's not mute at all. But it is important. We had a little bit of trouble yesterday with the lawyers being able to hear questions, and it appears it's persisting right now at least. And I think that the lawyers need to keep their face, you know, don't look down and read so much. Make sure you're making eye contact with the judge so you can see if the judge is speaking and stop even if you can't hear him. We know it's a challenge for everybody. All right. So I wanted to ask you about your contention that they took no action at all. That's just frankly not my understanding of the record. And, for example, with the December 16 incident where this supposed gift bag was left on your client's chair or in her office, I mean, I thought that the Human Rights Department did conduct an investigation, and they actually obtained handwriting samples and told everyone that, you know, if they found the responsible person, that person would be fired. I mean, they were not able, in fact, as we all know, to identify who was doing this. But it seemed to me, as I understood the record, that the city had done quite a bit each time to figure out who was leaving these threatening notes, et cetera. Am I misunderstanding the record? Well, actually, Your Honor, the May death threats were never investigated by the city. And the initial December incidents were investigated, you know, very, very minimally. This is what happened, Your Honor. And the city says it conducted an investigation and the trial court adopted that. But there is not a single note of any interview conducted in this December time frame. There is no investigative file to speak of. How do you do an investigation without speaking with, I'm sorry. Is an investigation the only way in which the city could have acted reasonably? I mean, it took plenty of other actions. You know, all it actually did was call a meeting and said that something unspecific had happened to Ms. Doe and not much else. That's per the testimony of Ms. Parker, who was in the meeting. She's an assistant director. They also gathered handwriting samples, but nothing was done with them. That's uncontested. They were never professionally analyzed. And even the court's finding that the meeting resulted in them being told that harassment is a terminable offense, that isn't even anywhere in the record. So there's a whole litany of things the city could have done but didn't. They take pride in the fact that they put cameras and installed locks, but that was six months after the fact. But there were reasons for that delay. I mean, the city, as I understand it from the record, needed to make sure that installing a camera was itself lawful. I mean, and that's understandable. So do you dispute? I mean, does the record not show that the city had to determine first whether it was lawful? I don't think that should have taken six months, five or six months, Your Honor. And I think that's a jury question whether or not that was reasonable. They did nothing to involve the police or building security. This is a unique employer. They literally have a police department at their disposal in the building. They have swipes in and out of the building and in and out of the office areas. Those could have been checked. Forensics could have been done to analyze the notes and contents of the gift bag, fingerprinting. That was never done. The handwriting samples were glanced at by a member of the Human Rights Office. They were never professionally analyzed. Do you have case law that suggests that a reasonable investigation entails what is essentially a criminal investigation? I mean, if they don't do DNA testing, fingerprint testing, do we have case law suggesting that that is required under Title 7? No, not required. But the point is, they should have done something beyond just call a meeting and say something happened to someone. With respect to the May incidents, staff was not even made aware of these death threats. How about advising staff that death threats have been made against a colleague, advising them if they saw anything? Do they know anything? Literally, the only thing in the record having to do with what was investigated as far as the early December incidents was based on Ms. Doe's testimony as to what she was told was done. And that was very minimal and it was ineffective. And five months later, she's getting death threats. And after the first death threat, the city still fails to take any action. Two weeks later, there's another death threat. So this is escalating severity and this is, you know, this is not fraternity hijinks. These are death threats against a high-level city of Detroit employee who's getting no assistance from her employer. Do you think it's appropriate, perhaps, to do staggered response? I agree that the May 2017 incidents were much more serious. But they did, it's like they responded in stages. They responded to this alleged gift with kind of telling everybody that this is unacceptable and a terminable offense. They thought they cured it. Nothing happened for five months. And then when a much more serious incident happened, they moved her office while they installed cameras and locked doors. And after that, I assume that nothing has happened. There's nothing in the record that suggests anything happened since May 2017, which suggests that maybe the remedy or the steps they took at that point actually cured the problem. Well, the harassment stopped after she went on TV and her story and the city's failure to act was televised. But it's not true that everybody was called into a meeting and told that this is a terminable offense. That is not in the record that they talked to anybody or even said that harassment is unacceptable. There was no sensitivity training. There was a real dearth of any effective remedial action. So that's why the harassment escalated. And that's why the police even admitted, you know, this slipped through the cracks. Had we gotten involved earlier, maybe we could have prevented this escalation. But now there's really nothing we can do. So I have cited something like nine cases, Your Honor, none of which the city of Detroit has addressed that all state that whether or not action is adequate is really a quintessential jury question. Smith v. Rockton is one of the key questions, key cases. And I've cited extensively to that. And this is an important point. What the city fails to do is just as important as what it does do. And I've tried to list off a thing, a list of things the city could have done that might have been of assistance to Ms. Doe. And in Smith v. Rockton, the court said, where the record contains a number of steps, a reasonable jury could agree the employer should have taken but did not. A reasonable jury could find that the employer's response was neither prompt nor appropriate in light of what it knew or should have known. So no response at all to the May death threats. And the response to the earlier threats was minimal and ineffective. And the Wyatt case and the Smith v. Rockton are directly on point. And they vote in favor of letting this claim go to the jury. On the retaliation claim, the district court found that there was no causal connection. In doing so, the court completely ignored the admission of Ms. Doe's supervisor that she told Doe, you threw me under the bus, related to Ms. Doe's human rights complaint, which implicated Ms. Hughley. And the court also ignored the continuum of negative actions that were directed by Ms. Hughley at Doe after this, you threw me under the bus comment. And it ignored the temporal proximity between Ms. Doe's protected activity, which continued through into July 2017. Your time has expired. You'll have your rebuttal time. Thank you. Ms. Hunt. Good afternoon, Your Honor. May I please the court, Monica Hunt, on behalf of the defendant city, Appellee City of Detroit. Your Honor, I'd first like to touch on the case that Ms. Loughbaum just mentioned. The Wyatt case is completely misdirected as it relates to this specific case. In that case, the court indicated that a three week delay in responding to harassment was too long. In this instance, it happened within a business day. It's my understanding that on December 16th, when the gift bag was given to the appellant, that following Monday was when the remedial action occurred. There was a department wide meeting in which all individuals within the department were advised of their anti-harassment policy, the negative implications if harassment were to take place. In addition, there was an investigation, there were interviews, there were separate meetings, and there was a handwriting analysis performed. Counsel on the other side suggests that's just not true. What is the best record site for us to look to show the investigation and the steps that were taken in December 2016? Well, Ms. Doe, in her deposition, she herself indicates that she was advised that there was an investigation taking place. Throughout the other depositions, the deposition of the police officer indicates that there was an investigation that took place. Ms. Hughley indicates that there was an investigation that took place. There were individuals throughout this case who testified that an investigation and additional actions took place. In addition, prior to Ms. Doe returning from her reassignment surgery, the department was proactive in meeting with their department and their members to advise that there was an anti-harassment policy, that there was an individual that was coming back that was having reassignment surgery, and they took proactive steps in order to make the environment for Ms. Doe a pleasant one. Upon her return, she indicated that it was a relatively pleasant environment upon her return. Further, after the December incident, six months went by without any additional incidents. The May incident occurred, and for her safety, Ms. Doe was moved to another office, and during that time, her office was equipped with locks and with a camera. That did take place prior to her interview with the television station. The appellant's argument that absolutely nothing happened or the minimization of what the city did is without merit. It is clear that they took the necessary steps in order to make certain that or to try to determine who the individual was that was performing this harassment and to make certain that that harassment no longer took place. So there were remedial steps and proactive steps taken. The appellant's argument that the city's actions were not adequate is not the standard, or that it didn't stop the harassment is not the standard. The standard is that the actions taken must be reasonably calculated to end the harassment. And as in the case of Waldo versus Consumers Energy, the court found that their actions that was taken in order to cease the harassment were reasonably calculated to end the harassment and was sufficient. The steps that the Waldo court indicated that were taken were the exact same steps that the city took in this instance. There were meetings, there were interviews, there was an investigation. And also both incidents were reported to the management team members to be on the lookout, to be aware of what was going on. Both the December and the May incidents in this case were in fact reported to everyone across the board and the management team for this awareness. The appellant's allegations that the city failed to act and condoned this action is without merit and the district court did not err in their determination in not reversing the dismissal of the claim. The appellant next argues that she suffered from adverse employment, specifically that she was not promoted due to her complaints. The only argument that is put forth by the appellant is that she felt that she was the most qualified and that she was the best person for this job. She failed to compare any of her skills or qualifications to the skills or qualifications of the individual that was appointed, Ms. Bounds. Ms. Bounds was equally, if not more qualified to take on this position than the appellant, considering she was successfully performing the position at that time. A co-worker of the appellant, Ms. Shiraji Parker, indicated that when this new job was created and when the appointments were taking place or being considered, it was their understanding that they were seeking to create a coordination and collaboration between the two departments here. And that was something that was missing in the past. It was also clear across the board that and widely known that the appellant was dissatisfied with the direction of the office and she had no interest in making sure that there was coordination or collaboration between the departments. Further, the decision maker in this case, Mr. John Hill, was not aware of any of the complaints that were made by Ms., by the appellant prior to his decision in hiring Ms. Bounds. More than six months had passed from the time of the complaint to the appointment of the new position. And while the appellant argues that there's overwhelming evidence of a causal connection between the complaint and the failure to promote, she doesn't necessarily provide any evidence to make that connection. The district court reasoned that the lack of temporal proximity between the alleged adverse action and the complaints did not satisfy the causal connection or the causation standard for retaliation. Similarly, the appellant argues that her argument for harassment lacked any true legal merit. The claim that Ms. Hughley, her initial supervisor, harassed her was not a part, was not legally analyzed by the appellant. Can I ask you a question on just the legal standard for the retaliatory harassment claim? So if it's a regular harassment claim, I take it the standard is you have to show severe and pervasive harassment or that's the well-established standard from the Supreme Court. I'm not entirely sure that that should be the standard for a retaliatory harassment claim because of the Burlington case. And so it would just be, would the harassment cause or dissuade a reasonable employee to make a complaint of discrimination? Do you think that the Burlington standard extends to this harass, the retaliatory harassment concept? So the legal standard here is just would a reasonable person be dissuaded from filing a complaint? Yes. And even if we were to take that standard here, there hasn't been any harassment that would fall into that category. Here, the claim is that, for instance, Ms. Hughley revoked one of her vacation days. It was clear that that was a mistake. Ms. Hughley understood that that was a mistake and she corrected it. She also claims that her performance reviews went down. Well, in fact, Ms. Hughley gave her better performance reviews after her reassignment surgery, after the complaints were made than prior to the complaints being made. Ms., the appellant provided no information or evidence of there being any adverse employment actions taken against her, that there were no, her job was not in jeopardy, her job was not, none of her benefits were taken from her, none of her job duties or responsibilities was taken from her. She hasn't provided that there was any true harassment that took place from her supervisor or from anyone else other than this unknown individual, which was dealt with by the city. Additionally, her argument that Ms. Bounds harassed her or retaliated against her by providing her with lower evaluation scores than Hughes, these evaluation scores were in line with her initial evaluation scores when she first started. Furthermore, between both Ms. Hughes and Ms. Bounds, there's no causal connection between the complaints that were made almost a year earlier to these random acts of perceived harassment. Further, the appellant chose to remain silent in her legal analysis in response to the plaintiff's, or I'm sorry, to the city's motion for summary disposition. This is her second bite at the apple of trying to get the merits as a part of the record. However, the district court ruled that not only were these arguments waived because they were not brought up at the summary disposition level, even if they were to be considered, they would not be 6-0 because they did not meet the prima facie case or meet the standard required. Therefore, your honors, the city requests that this honorable court affirm the district court's ruling, and I yield my time. You have nothing further, correct? That's correct. All right, you'll have your rebuttal, Ms. Lofbaum. Ma'am, you're muted. I apologize. The only record evidence of what was done with respect to this initial, the initial incidents of harassment is Ms. Doe's deposition testimony based on what she was told it was secondhand. Counsel said that Mr. or Officer Bolden's testimony confirms the investigation. That had nothing to do with December 2016 events. That was whatever that city did in July of 2017, seven or so months later. Let me go back to my retaliation claim. The trial court, in addition to ignoring the threw me under the bus incidents, ignored the continuum of hostility directed at Ms. Hughley following those. And that included, you know, suddenly unapproving a vacation request that had just been approved, nitpicking Ms. Doe's attendance, putting her on an attendance plan, docking her for taking a time off, even though she had available vacation time. Despite Ms. Doe's pleas that she'd be allowed to be in an office on a different floor, Ms. Hughley insisted she come back down and had all her things removed behind Ms. Doe's back. So when she arrived at work one day, she was back down on the original floor. She was passed over. Was it unreasonable for the city to expect her? They had outfitted this office with the lock and a camera. Was it unreasonable for the city to expect that to be the place where she worked? No, but she was moved down. I believe she was moved down to that floor before there was cameras and locks installed. And even after she had the locks and cameras installed, it's uncontested, she was chastised for leaving her door open, or not leaving her door closed. She had to have it open. So you're right, Judge Murphy, the standard is whether the repercussions from the protected activity were such that a reasonable person would be dissuaded from complaining. And that's the truth. With respect to Mr. Hill, who is apparently the decision maker in the denial of Ms. Doe's promotion, if he wasn't aware of her protected activity, why didn't the city submit an affidavit saying that? In fact, this is in the record, Ms. Doe showed Mr. Hill, the CFO, one of these horrible death threats. He was well aware of what was happening to her. So I have listed both many examples of the retaliatory harassment by Ms. Hughley and the retaliatory harassment by Ms. Bounds. And at the end of the day, the city has not even contested that Ms. Doe's credentials were far superior than Ms. Bounds. They didn't say one word on that. So that's uncontested. Well, you have the burden on that issue, don't you? Right, but counsel just said that the other person's credentials were so far superior. There's no record of that anywhere in the record. In fact, I've cited a dozen or so ways in which Ms. Doe's credentials were far superior to that of Ms. Bounds. All right, your time is up. We appreciate the argument, both of you. There weren't even more questions, were there? No. Your time is up. We appreciate the argument both of you have given, and we'll consider the case carefully. Thank you. Thank you.